IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GREGORY CHARLES ROYAL DBA
AMERICAN YOUTH SYMPHONY                )
                                       )
            Plaintiff,                 )
                                       )
                                       ) No: 1:07-cv-01280 (JDB)
        v.                             )
                                       )
OXYGEN MEDIA, LLC.                     )
            Defendant.                 )
_____ )

## PLAINTIFF'S OPPOSITION TO DEFENDAN'T MOTION TO DISMISS

Plaintiff pro se, Gregory Charles Royal DBA American Youth Symphony respectfully
moves the court to deny Defendant Oxygen Media, LLC's Motion to Dismiss because
this court does in fact have general and specific jurisdiction over Defendant as set forth in
13-423(a) 1,2,3, and 4 of the District of Columbia Long Arm Statute and the jurisdiction
of this state would not violate Defendant's right to due process under the 14th
Amendment.

## PRELIMINARY STATEMENT

At the time of this filing, Plaintiff has a pending motion requesting jurisdictional
discovery. Plaintiff requests that this current motion be held IN ABEYANCE, if the court
deems necessary in deciding this motion, until jurisdictional discovery can occur.
Plaintiff has filed this current motion in accordance with this court's order requiring
Plaintiff to file an Opposition to Plaintiff's Motion to Dismiss by September 7, 2007.

Plaintiff asserts that Defendant's purposeful and necessary contractual actions with
District of Columbia cable systems over the past 7 years, the significant income it
receives from the subscriber fees of District of Columbia consumers, that Defendant's
programming reasonably exists in the District, in part, to satisfying a specific public
video content policy, and that Defendant's actions caused harm inside the District, clearly
subjects Defendant to the personal jurisdiction of this court.

Defendant, a company valued at over 1 billion dollars, would not be unreasonably inconvenienced by traveling 2 to 4 hours from the state of its incorporation (Delaware) or the state of its physical offices (New York).

Plaintiff would like to bring to the court's attention, the possibly perjurious affidavits of Keith Minarik and Erica Diaz who make statements well beyond the scope of a disputed version of the facts. Plaintiff hopes that this court, after considering Plaintiff's brief, will discount their statements accordingly.

## STATEMENT OF RELEVANT FACTS REGARDING JURISDICTION

### Defendant Conducts Purposeful Business in the District with it's "Server"

The essence of Defendant's business is merely the distribution of his video content. Transmission of video programming does not require physical acts normally associated with brick and mortar distribution activities such as travel and shipping.

Oxygen Media LLC, like a website, possesses content that must be distributed by a "server" for it to effectively "come alive" and exist in the public. The "cable system" is Defendant's "server".

Oxygen Media LLC, lacking its own UHF or VHF signal i.e., a television station, is *incapable* of broadcasting its own content.[See Def. Motion to Dismiss page 2. Oxygen admits to being a 24 hour cable network, not television network or station]

That incapability to broadcast its own programming means that the Oxygen Media LLC, like all cable content providers, is relegated primarily to cable distribution of its content. Accordingly, cable content providers must actively seek cable systems to distribute their programming and achieve greater audience penetration. This is not a passive endeavor, as the diversity in channel line-ups amongst various cable companies suggests, cable systems do not automatically carry any and every cable content provider.

Mandated by the FCC and local municipalities, cable distribution is also unlike broadcasting in that cable distribution in the United States, as evidenced by cable franchise agreements, is a complicated web of local grids that individually cannot extend beyond any particular locale- broadcast UHF and VHF waves of television stations can extend city's, state's and even country's boundaries.

Cable systems operate by way of local franchise agreements which are between local municipalities and **local** cable systems. [See entire District of Columbia Franchise Agreements at http://octt.dc.gov/information/legal_docs/index.shtm. First pages attached herein].

Though the public is familiar with names such as Comcast and Time Warner Cable, these corporations are actually a compilation of hundreds of local cable system franchises. In Washington, DC the only cable system franchises authorized by law to distribute cable programming is Comcast Cablevision of the District LLC and Starpower Communications LLC. [See Franchise Agreements]
Though the public knows these companies as Comcast and RCN, they are individual legal entities with physical locations in the District of Columbia licensed to business only in the District of Columbia. In fact, a foreign cable system, even one owned by a parent company of a District cable system, would be technically and legally incapable of distributing cable programming within the District of Columbia. [See Franchise Agreements at http://octt.dc.gov/information/legal_docs/index.shtm]

Oxygen Media LLC, unless it is giving its programming away for free, entered into some affiliate agreement involving Comcast Cablevision of the District LLC and Starpower Communications LLC in order to have its programming shown in the District of Columbia 24 hours a day for the past 7 years, which has indeed been the case. Plaintiff would need jurisdictional discovery to ascertain the specifics of those agreements.

Defendant's website, www.Oxygen.com, provides a service which matches viewers by address, with specific local cable system franchises in which it does business. Potential

3

viewers can then  discern if Oxygen is available in their area. [www.Oxygen.com click on link "Looking for Oxygen?" or click on FAQ's "How do I get my cable provider to carry Oxygen" at http://oxygen.com/basics/about.aspx]

## Subscriber Fees Derived From the Washington, DC DMA

It is common knowledge that a cable companies' primary sources of revenue are derived from monthly cable subscriber fees and advertising. "Oxygen" which launched in 2000, has received subscriber fees from District consumers for the past seven years.

Oxygen Media LLC, recently valued at over 1 billion dollars, is reported to receive 9 cents per subscriber per month. [ See http://multichannel.com/article/CA6467844.html with additional references]

There are an estimated 2.4 million total television households in the Washington, DC Designated Market Area (DMA) which is ranked by the FCC at #8 in the country [See Grid at http://www.pbs.org/newshour/media/conglomeration/map.php?dma=8]

Oxygen Media LLC  has 71% national penetration (including cable and satellite)  which would amount to about 1.7 million households in the Washington, DC DMA.[http://www.mediaweek.com/mw/news/recent_display.jsp?vnu_content_id=10035 36319]

At 9 cents per monthly subscriber, Oxygen Media LLC   receives about $153,000 per month or nearly $1.8 million per year from subscriber fees in the Washington, DC DMA. These amounts do not include revenues from District advertisers such as Plaintiff. Based on these figures, Oxygen Media LLC has aired approximately 61,320 hours of programming and derived about 12 million dollars from fees paid by District of Columbia DMA subscribers since the year 2000.

## Defendant's Advertising Revenue Derived From Washington, DC DMA

It is the experience of Plaintiff, that advertising on Oxygen is available from their New York office and from Washington, DC through the local cable systems. Oxygen's advertisements arranged in New York, including Plaintiff's 30 minute paid program time, can be preempted at anytime by advertisements placed on Oxygen at the local level, as told to Plaintiff by Keith Minarik of Oxygen Media.

Oxygen sells and solicits advertising from its New York office, its website, local cable systems, satellite systems and independent brokers.. [See Def. Motion to Dismiss page 3 regarding offerings by website; a local example at Comcast Spotlight at http://www.comcastspotlight.com/sites/Default.aspx?pageid=2467&siteid=62&subnav=2 and Def Motion to Dismiss page 3 regarding Backchannel Media Inc, an independent broker]
According to Lisa Gersh, Oxygen president and COO, the network brokered over $100 million in advertising sales in 2006. [See http://www.mediaweek.com/mw/news/recent_display.jsp?vnu_content_id=1003536319]

The Washington, DC DMA comprising of Oxygen's 1.7 million subscribers or 2.3% of total subscribers, equals and advertising "share" for the Washington, DC DMA of about $2.3 million dollars. While there is no way to discern, except though discovery, the actual revenue derived from Washington, DC DMA advertisers, this estimate provides some basis for advertiser's expenditures and Oxygen's gains in the Washington, DC DMA.

## Defendant's Relationship With Plaintiff

Oxygen Media was first introduced in any meaningful way to Plaintiff by Backchannel Media, a Boston corporation who sells advertising time on behalf of Oxygen Media LLC in January 2007. Following this introduction to Oxygen, Plaintiff began watching Oxygen programming and perusing it's website in the District of Columbia to confirm what Plaintiff anticipated would be an ideal venue to air his program. Plaintiff was well aware that any relationship with Oxygen was on the sales or advertising side of Oxygen's business, not the programming side. (See Backchannel Media Sales Order Confirmation)

Oxygen Media LLC is comprised, to the extent of Plaintiff's interactions, with an advertising arm, a programming arm, and a marketing arm. Oxygen's New York advertising arm is carefully segmented by region to assign a potential advertising buyer with a representative near his geographic location. Oxygen prefaces each call inquiry for advertising, as witnessed by Plaintiff, with "what state are you calling from". [See additionally http://oxygen.com/basics/advertise.aspx which designates advertising regions]

In early January 2007, following Plaintiff's initial contact, Plaintiff was in turn solicited with the prospect of airing America's Hot Musician as a paid program on the Oxygen Network by Backchannel Media, a Boston, MA company which sells advertising time on behalf of Oxygen Media LLC. Backchannel Media's relationship with Defendant is not as a buyer of media time except in the most hyper-technical of senses, but rather as a broker-as Backchannel Media, to Plaintiff's knowledge, possesses no programming of its own and communicates specific insider pricing information of Defendant for the sole purpose of procuring commissions on advertising sales. Backchannel Media received $250 from the $6,500 paid for Plaintiff's program slot on Oxygen. Such a profit margin (+3%) is consistent with a sales commission.[Backchannel Media website at http://www.backchannelmedia.com/]

Plaintiff found Defendant's paid advertising pricing and branding of women's programming content very attractive especially after viewing and pursued a buy. On January 23, 2007 Plaintiff received an email from Backchannel Media stating that Keith Minarik of Oxygen Media was "eager to see the show and get it approved for airing..." and was instructed to rush a DVD to Minarik which Plaintiff did.

On January 29, 2007 following a previous conversation on January 26, 2007 in which Minarik stated that he received Plaintiff's DVD, Keith Minarik contacted Plaintiff by telephone at (202) 302-6703 in Northwest Washington, DC and told Plaintiff that he viewed the program and that (based upon that pilot of the program) it was approved for airing. (Complaint ¶7) Plaintiff reiterated to Minarik that the program was being re-shot professionally and that the production quality would vastly improve. At that point in the conversation, Minarik expressed a concern to whether or not mechanical rights for music

within the program were cleared and noted that a statement from Plaintiff asserting mechanical clearance would be good for him to have. Plaintiff verbally asserted that there were no mechanical issues while speaking to Minarik and agreed to issue a statement. Plaintiff informed Backchannel Media on January 29, 2007 in an email that Minarik had approved the program and in that same email, issued a statement that *"America's Hot Musician TM has no mechanical rights or copyright conflicts. The program either uses music in the public domain, music written by our producers or original music by the competitors of which they sign a permission and waiver document."* Several communications between Plaintiff and Keith Minarik occurred between January and May, 2007 in which no further mention of any looming copyright issues were mentioned.

In February, 2007, following an email from Backchannel, a conversation occurred between Plaintiff and Minarik concerning a significant hike in Oxygen's half hour rate. In that conversation, Minarik communicated to Plaintiff that the original price quote of $6,500 per half hour made to Plaintiff by Backchannel Media would be increased to $8,200 because the Oxygen Network was being added by DirecTV, a satellite provider, increasing Oxygen's subscriber base from 60 million to 71 million. Minarik specifically stated "that's why the $6,500 you are paying has to go up". Plaintiff has never disclosed to Minarik how much he was quoted by Backchannel Media.

In April, 2007, in another telephone conversation regarding advertising rates , Minarik told Plaintiff to limit his conversations within Oxygen to him, that "he was the guy", and to call him with any questions or concerns regarding Plaintiff's program. This conversation occurred following conflicting information Plaintiff was receiving from Oxygen employees and Backchannel Media regarding Oxygen's rates

The affidavits of Bridget Collins and Elizabeth Howie in Defendant's Motion To Dismiss are undisputed with regard to relevant issues, with the *exception* that Plaintiff's initial communications with Ms. Collins go back to a February 27 and a March 22, 2007 email, weeks prior to her communications to Plaintiff. The two emails are as follows:
February 27,2007

*Debby Beece President of Programming and Marketing Oxygen Media LLC Dear Ms. Beece,Our organization is seeking a special request to air America's Hot Musician (show website at www.americashotmusician.org) currently slated to air on Oxygen at 7:30am on Saturdays beginning July 7, 2007 for 12 weeks, to a later time of day in Oxygen's program schedule.  We understand that this time does not exist, as we currently occupy the latest paid time slot, but we hoped that the mission of the program might justify your consideration. The information about the mission of the program  which will be judged by National Symphony Orchestra Violinist Marissa Regni and myself, a Duke Ellington Orchestra alum, is located at the above website address. We thank you in advance for your attention and consideration. Sincerely, Gregory Charles Royal Artistic Director American Youth Symphony 507 Roosevelt Blvd. Suite C-220*
*Falls Church, VA 22044(202) 302-6703 cc: Stephanie Ziev **Bridget Collins***

The other email was sent directly to Ms. Collins on March 22, 2007 following an iquiry with Oxygen's Marketing Department:

*Dear Oxygen Marketing Department, Our organization American Youth Symphony is producing the television program America's Hot Musician( www.americashotmusician.org ), an American Idol-like competition for instrumental musicians set to run on Oxygen from July thru September 2007.  The purpose of the program is to promote instrumental music within the MTV/Hip Hop Generation. The program is also a strong vehicle to promote women in music as two of the judges are National Symphony Orchestra Principal Violinist, Marissa Regni and former Kitte bassist Talena Atfield. We are seeking to cross promote the auditions on the Oxygen.com website and Oxygen shows on our website, www.americashotmusician.org . With the addition of Talena as a judge, we have gotten thousands of  inquires (a sample of her can be viewed at this URL: http://youtube.com/watch?v=_WcveimnxUY ) in the past couple of days. A fan suggestion was to have a link on the Oxygen site for female musicians to sign up for the show, which begins taping in May. We felt this was a good marketing idea, especially because of the mission of the program. Any consideration you could give us would be greatly appreciated. Sincerely,Susan Veres,Executive Director American Youth Symphony 262 16th Street SE Suite 3 Washington, DC 20003(202)302-6703*

From January through May, 2007, any communications with persons contacted by phone within Oxygen's sales or programming department included a question by Plaintiff- if they had heard of Plaintiff's program and/or had gone to Plaintiff's website. The question always received a response of either "yes" or, "no but I will take a look at it".

Defendant's advertising and programming arms were well aware or became well aware of Plaintiff's program and Plaintiff's website content from January thru May, 2007.

Plaintiff's February 27, 2007 request to change the time of the program, which was never communicated to Backchannel Media, but rather to Oxygen's Director of Programming Debbie Beece and Bridget Collins, was responded to within hours by Backchannel Media and implicating Keth Minarik in the following email:

*Tue, 27 Feb 2007 11:17:22 -0800 (PST)*
*dhunt@backchannelmedia.com  Add to Address Book  Add Mobile Alert*
*To: info@americanyouthsymphony.org*
*Subject: Oxygen*
*CC: **KMinarik@oxygen.com**, minsalaco@backchannelmedia.com*
*Hello Greg,*
*In July Oxygen is going up 15 million homes as they are being added to the DirecTV lineup. We are going to need to get $8200 per hour when the additional homes are added. If you want to go on before that the rate will be $7,200. **Also Oxygen can not open anytime later in the day**. [Emphasis added] Thanks, Damon Hunt Vice President of Sales Backchannelmedia, Inc. P 617-728-3626 x102*

Defendant's marketing arm was also aware of Plaintiff's program in addition to the communications with Bridget Collins, from Defendant's fan mail correspondence. On March 27, 2007 feedback@oxygen.com corresponded to an inquiry regarding Plaintiff's program that *"......America's Hot Musician is not scheduled to air until this summer. Unfortunately, we do not yet have the details as to the show's time or musicians.*

*Make sure to check back with our website for more information as we get closer to the launch date".*

The affidavit of Erica Diaz is blatantly false. Plaintiff contacted Diaz in May, 2007 in which they spoke about the possibility of Diaz reviewing the program after the first round was shot in late May, 2007. Diaz indicated that after looking at the website, the concept of the show may not fit Oxygen's programming, but that she would reserve judgment until she actually reviewed the program. Diaz instructed Plaintiff to contact her after the show had been shot. Plaintiff inquired what would be her preferable viewing format and Diaz indicated DVD. At or around June 4, 2007 Plaintiff contacted Diaz from Washington, DC to let her know that a rough cut of the first episode was completed and if Plaintiff could meet with her in New York to deliver and briefly discuss the DVD. Diaz stated that it would be fine and was very amicable. On Friday June 7, 2007 Plaintiff contacted Diaz after arriving in New York whereby Diaz gave Plaintiff some options for meeting her. It was decided that the best time would be after she got out of a 3:00pm meeting. She also warned Plaintiff that getting to Oxygen's offices was tricky because it was in a congested farmers market in Chelsea. Diaz instructed Plaintiff to go all the way to the end of the market to take an elevator with a picture of Tori Spelling on it up to Oxygen's offices. Diaz then made a derogatory or cynical comment about the Tori Spelling show, which airs on Oxygen, and said she looked forward to meeting me and that she would just have time for a short chat.

Plaintiff's meeting went as planned and Plaintiff reiterated that the program was cast to promote woman by way of the program's judging panel and competitors. Diaz also stated to Plaintiff that Oxygen's budget for daytime programming was very small due to the fact that it airs programs from a video library. Plaintiff stated that he would be amicable to even a barter of the program to get it started and Diaz said that she would inquire if a barter was even possible because she had never heard of one done at Oxygen. Diaz was very pleasant and asked Plaintiff to give her a couple of weeks to view the show because things were really busy at Oxygen. Her last words to Plaintiff were that she would "keep an open mind" in viewing the show and Plaintiff thanked her for taking the time.

As stated in Plaintiff's Complaint, and unbeknownst to Diaz according to her affidavit, Oxygen Media had already sent Plaintiff a Cease-and-Desist Letter before Plaintiff's January 7, 2007 meeting with Diaz.

Plaintiff incorporates the remaining statement of facts within the Complaint and corrects a date error in the Complaint in paragraph 13. June 6, 2007 should read June 9, 2007 as the date when Plaintiff actually read the Cease-and-Desist letter.

## ARGUMENT

## I-Defendant Meets The Conditions of 13-423(a) 1,2,3, and 4 of DC's Long Arm Statute Subjecting Him to this Court's Jurisdiction on many Fronts.

### Oxygen's Business Model Resembles A Website Business

The intrinsic nature of a video content provider distributing its programming to the public is akin to the relationship between a website and its server. Accordingly, the absence of the need to have physical offices or traveling personnel, is not indicative of any lack of contact with a forum considering Defendant's type of business. . Specific jurisdiction "may not be avoided merely because the defendant did not physically enter the forum State," since "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted"); Burger King Corp.v. Radzewicz, 471 U.S. 476

Even though Oxygen's historical contact with the District of Columbia involves the transmission of video signals, it makes the point that Oxygen is, nonetheless, a very popular and lucrative enterprise within the District of Columbia.

### Oxygen's Activities in the District Are Systematic and Continuous

District of Columbia Long Arm Statutes states in pertinent part that a court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business or engages in any other persistent course of conduct in the District of Columbia.

Oxygen programming does not appear in the District as the result of some passive act by Defendant, as what might occur with broadcast "spill over" or when products are shipped and sit on a store shelf. Defendant does not broadcast its programming nationwide as erroneously stated in its Motion to Dismiss. The distribution of Defendant's programming within the District of Columbia occurs by way of specific contractual agreements involving local cable systems here. Defendant had to have reasonably pursued and/or been engaged in a business activity in the District to facilitate the airing its 24 hour a day programming for the past 7 years- even if those activities did not require the physical presence of Defendant in the state. In Quill Corp. v. North Dakota, 504 U.S. 298, 308 (1992), the court held that "requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing State". Furthermore, fact that Defendant may repeat these steps to distribution by executing channel agreements in various metropolitan areas is irrelevant to jurisdiction under the DC Long Arm Statute.

The inherent complexities of the cable industry which involve several schemes at the local level including the calculation of subscriber fees, advertising commissions, tiered programming, Video on Demand, and transmission specifications, not to mention the complex written agreements between participants, dictate that Defendant cannot not be a passive participant in his dealings with cable systems, including those within the District of Columbia. The fact that Defendant has been able to air its programming in the District for 7 years demonstrates its activities were continuos, substantial and a persistent course of conduct.

## Oxygen's Could Reasonably Anticipate Being Haled into Court in the District

Notwithstanding Plaintiff's complaint, could Defendant reasonably anticipate that he could be haled into court in the District of Columbia?

The cable channel agreements of local cable systems require that video content providers carry errors and omissions insurance and name the *local* cable systems as additionally insured. [See attached Cable Channel Agreement] (Without jurisdictional discovery, however, Plaintiff cannot ascertain the specific terms of Defendant's Insurance.)

If Oxygen somehow failed to deliver programming to the local cable system, or slandered or offended someone in the District on one of its reality programs such as the racy "Talk Sex" program which features live callers, it could reasonably expect, and is *locally insured in anticipation of*, being sued in the District of Columbia- or any location where its program may have offended.

In Defendant's Motion to Dismiss he admits as such in attempting to disprove specific jurisdiction when he cites on page 21, Zimmerman v. United States Football League, 637 F. Supp. 46,48 (D. Minn.1986): "Where a plaintiff's cause of action does not arise from television broadcasts into a state, the broadcasts do not constitute sufficient contacts for personal jurisdiction". Clearly the courts recognize that video content providers can expect to be haled into court wherever their programs *do* offend and as such, content providers carry errors and omissions insurance for themselves *and* the local cable systems- a contractual relationship. This reasoning would hold especially true for the District of Columbia whose intent is to reach out across state lines with its Long Arm statutes.

Therefore, the mere activity of distributing video programming has an industry recognized, inherent risk of liability and accordingly, an inherent expectation of litigation wherever a program airs. Consequently, video content providers pay for protection in the form of insurance not only themselves, but for their local cable "servers".

In John P. Ruditis, v Time Warner Cable - St. Augustine, FL, before the FCC 1998, Time Warner St. Augustine addressed the need for protection against risks associated with the transmission of all programming citing the need for media perils liability insurance, also

known as broadcasters' liability/errors and omission insurance, protects cable systems from the content of programming including advertising, copyright infringement and trademark claims, obscenity allegations and other content-based claims, whether such claims are meritorious or not. [See Comcast Lease Agreement].

## Oxygen Doing Business in the District Derives Millions from Subscribers

The District of Columbia Long Arm Statute states in pertinent part that a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he **engages in any persistent course of conduct**, or **derives substantial revenue** from goods used or consumed, in the District of Columbia.

Oxygen exists in the District of Columbia because of significant monthly program fees *paid* by District subscribers who hold a certain public confidence with Defendant's programming. Generating nearly 2 million dollars per year from nearly 2 million households in the Washington, DC DMA is significant, especially because subscribers pay pennies per month at 9 cents.

In *The Founding Church of Scientology of Washington, D. C. v. Heinrich Bauer Verlag et al.* the court opined  that "recognizing the low unit price of each magazine, we think that sales of $26,000 in ten months constitute "substantial revenue" and demonstrate contacts that are sufficiently substantial to establish the "reasonable connection" with the District required by D.C.Code s 13-423 and the Constitution" *Founding Church of Scientology of Washington, D.C. v. Verlag, 536 F.2d 429, 432 (D.C. Cir. 1976.*


## Oxygen's Programming Satisfies a Specific Mandate of the DC Cable Franchise Authority's Public Policy, Thereby Providing A Service Under 13-423(a)(2).

13-423(a) of the District of Columbia Long Arm Statute states in pertinent part that a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he **derives substantial revenue** from services rendered, in the District of Columbia.

Comcast Cable of the District LLC and Starpower Communications LLC  are required to provide diversity programming as set forth in Appendix Section V paragraph 3 (page A-8) of their  cable franchise agreements in the pertinent categories of  "....Programming targeted to ethnically diverse communities, and other targeted programming".
Oxygen advertised mission is programming for women. Their niche programming can reasonably be assumed to materially contribute the cable systems' predetermined genres of required programming.
Furthermore, Oxygen engages in the act of providing  24 hour woman's programming to the District cable systems, fulfilling those systems' obligations to hundreds of thousands of District consumers. These two purposes demonstrate that Oxygen programming satisfies a mandated, public purpose pursuant to *§ 13-423(a)(2)  contracting to supply services in the District of Columbia.*


## II- Defendant's Conduct Inside  and Outside the District of Columbia Caused Harm to Plaintiff and Stakeholders Inside the District of Columbia.


**Defendant's Alleged Tortious Conduct Caused Harm Within the District of Columbia by Injuring Plaintiff's DC Based Organization, its DC Based Television Program, and its DC Based Stakeholders, Further Establishing this Court's Jurisdiction.**
The District of Columbia Long Arm Statute may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;   (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any

other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

This claim arises from Oxygen Media LLC's unilateral action in sending Plaintiff a Cease -and-Desist letter and other communications in the District of Columbia or directed at the Plaintiff's organization in the District.

The letter, which demanded that Plaintiff discontinue the use of Oxygen's tradename, had the instant effect of canceling Plaintiff's program because without Oxygen's tradename Plaintiff could not communicate where the program was airing on television.[See cease and Desist Letter Complaint]

The Defendant's actions reached beyond Plaintiff in the District of Columbia to extend to others in the District.

Plaintiff's organization, American Youth Symphony, is a Washington, DC based non-profit organization which produced the program in question called America's Hot Musician located during the claim period at 262 16th Street SE Suite 3 Washington, DC 20003. The organization has a history in Washington, DC going back to 1982. Most recently Fox5 News did a feature story on the organization's Plight of American Music Initiative Conference held at the Martin Luther King Jr. Memorial Library in Northwest Washington, DC.. Additionally, the stakeholders of the program are all highly respected members within the Washington, DC (proper) community. Susan Veres , Executive Producer, is also Deputy Director of US in the World at the New America Foundation. Marissa Regni, Judge, is the Principal Second Violinist in the National Symphony Orchestra. Henry Joseph, Director, is the founding partner and instructor at Fortex Video Production School.

The program is also billed as a Washington, DC program and was principally produced inside Washington, DC. Competitors from around the country came to Washington, DC to participate in the program and the narration within each episode of the program states:

16

"Musicians from all across Americas came to Washington, DC for this, the first season of America's Hot Musician".

The cancellation of the national debut of Plaintiff's program caused not only embarrassment and disappointment to each of the stakeholders, but also caused financial harm to the stakeholders, as each agreed to offer their services toward the program in exchange for a future royalty derived from advertisers within the program. Additionally, production costs in the thousands of dollars where expended by Plaintiff's organization in Washington, DC to produce the program which never aired on the channel for which it was intended-the Oxygen network. The program was cast following approval of the pilot by Oxygen and was cast to specifically appeal to Oxygen's female demographic. It could be debated as to whether the Cease-and-Desist letter is cause in and of itself for this court's jurisdiction but the end result is the same: Causing harm to persons within the District of Colombia.

**Defendant's Alleged Tortious Conduct is the Result of Actions Between the Plaintiff and Defendant Directly, not a Third Party.**

This dispute is between American Youth Symphony and Oxygen Media LLC. Only Defendant had the authority to approve the program and issue a Cease-and-Desist demand which Defendant in fact did. Defendant implicitly affirms in it's June 1, 2007 Cease-and-Desist Demand that Oxygen intended to air Plaintiff's program- two days following payment on May 29,2007. This affirmation lies in the fact that the Cease-and-Desist Demand did not claim that Plaintiff's program was not scheduled to air, but merely that Plaintiff must refrain from usage of Oxygen's trademark and tradename in association with that airing. It is this specific course of action, following an opportunity to rectify, which initiated Plaintiff's claim.

Without discovery, it is not possible to discern Oxygen Media LLC's and Backchannel Media's business arrangement for payments. The fact that Backchannel Media clearly places orders for air time with Oxygen Media and that Defendant in his Motion to Dismiss, classifies Backchannel Media as "media buyer" would reasonably indicate that there was a revolving account- broker places orders for time and is billed. Regardless,

the fact remains that Plaintiff made payment for $6,500.00 in the manner approved and sanctioned by Defendant- as evidenced by the history of emails between Backchannel Media to Plaintiff and Keith Minarik.

**6. Notwithstanding Deference given by Courts to a Plaintiff's Choice of Forum, Oxygen Media, LLC's Right to Due Process Would Not be Violated nor Would an Undue Burden be Placed Upon this Defendant as a Result of the Jurisdiction of this Court.**

Plaintiff's choice forum should not be disturbed unless >>>>>>>. Defendant is a billion dollar corporation whose choice forum(s) (New York or Deleware) are between 100 to 200 miles away. It was Defendant's choice to further complicate their own litigation by removing this matter from DC Superior Court where they could have easily challenged that court's jurisdiction. Defendant is clearly using the court system in a manner to gain some perceived advantage rather than for some legitimate logistical concern. Defendant has already filed affidavits on the principals involved in this case and presented its defenses in its Motion to Dismiss. As a practical matter, this case, if Defendant's Motion to Dismiss is denied, would be nearly ripe for discovery and trial. This case has matured to the point where starting over in a new forum on this "contract matter" would not be in the best interest of the federal court system. If this case were to progress to discovery, Defendant would presumably still have to travel to Washington, DC. Lastly, there is no comparison in the financial condition of Plaintiff, proceeding in forma pauperis, and Defendant, a billion dollar corporation. Plaintiff will already have to absorb costs of discovery, including depositions in New York. A change of venue would be a great hardship on Plaintiff.

## PLAINTIFFS' INJURIES ARISE FROM DEFENDANTS' FORUM-RELATED ACTIVITIES.

Plaintiff's interaction with Defendant's entertainment and advertising programming in the District created the scenario by which Plaintiff accepted an offer to purchase advertising from Defendant. Defendant was not a passive participant nor was this purchase done at arms length. In fact, Defendant was engaged with Plaintiff, as evidenced by emails and

phone calls to Keith Minarik, in facilitating the purchase of advertisement with Plaintiff in Washington, DC. Keith Minarik viewed Plaintiff's program for approval. There is in the least, a discernable relationship between the act of Defendant's programming in the District and the Plaintiff's auditioning of that programming in the District for the purposes of entering into business with Defendant.

In Shoppers Food Warehouse v. Moreno, the court held that "because plaintiff's claim had a "discernable relationship" to [Defendant's] advertising, the [Defendant] supermarket could have reasonably anticipated being haled into Court to defend against a personal injury suit brought by a D.C. resident.

Shoppers Food Warehouse v. Moreno, A.2d , No. 96-CV-21

## CONCLUSION

For the reasons mentioned herein, Plaintiff respectfully requests that PLAINTIFF'S OPPOSITION TO DEFENDANT MOTION TO DISMISS be GRANTED.

.Dated this 7th day of August, 2007.

Respectfully submitted,

Gregory Charles Royal
DBA American Youth Symphony
507 Roosevelt Blvd. C-220
Falls Church, VA 22044
(202) 302-6703

19

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY  that on this 7th day of ~~August~~ Sept., 2007, a copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDAN'T MOTION TO DISMISS  was served via email and by first-class mail, postage pre-paid upon:

Constance M. Pendleton
conniependleton@dwt.com

and
Constance M. Pendleton
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W. Suite 200
Washington, DC 20006-3402

Gregory Royal

Logged in successfully





# Advertiser Sales Order Confirmation
## BCM Agreement; 1284-070707; American Youth Symphony

## Basic
Sales Person: Hunt, Damon
Advertiser: American Youth Symphony
Campaign Name: America's Top Musician
Avail Type: long

## Avails

|   | Media Outlet | From | To | Duration | Weekdays | Time | Avails | Advertiser |
|---|---|---|---|---|---|---|---|---|
|   | Oxygen Network | 07/07/07 | 07/07/07 | 30 min | S | 07:30 AM - 08:00 AM | 1 | $6,500.00 |
| **Total:** |   |   |   |   |   |   | 1 | $6,500.00 |

## Payment Terms

| Flight Date | Cancel Date | Advertiser Pay Date | Invoice Date | Payment Period | Memo |
|---|---|---|---|---|---|
| 07/07/2007 | 06/04/2007 | 05/31/2007 | 05/21/2007 | One Time Payment |   |

**Please click the 'Accept Agreement' button or print, sign, and fax the agreement to (617) 517-7777 within 2 business days.** An immediate response is necessary for media time airing less than one month from the date of this Sales Order. Failure to respond to this Sales Order within 2 business days results in the cancellation of the purchase. Your acceptance of this Sales Order will signify a binding contract. You agree to adhere to the media outlet's tape traffic and/or satellite delivery practices. Proof of Performance shall be provided by the station to you through Backchannelmedia, Inc. upon completion of this contract.

Any questions or comments concerning this contract can be directed to **Alex Johnson** at **617-728-3626 ext.104**, or email **ajohnson@backchannelmedia.com** or to your sales representative, **Damon Hunt** at **dhunt@backchannelmedia.com** .

This agreement has already been **accepted** by info@americanyouthsymphony.org.

© 2007 Backchannelmedia

Attachment 2

THIS AGREEMENT, executed in duplicate this 21st day of October, 2002, by and between THE DISTRICT OF COLUMBIA (hereinafter referred to as the "District"), by the Mayor of the District and the Chairman of the Council of the District, party of the first part, and COMCAST CABLEVISION OF THE DISTRICT, LLC (hereinafter referred to as the "Company"), party of the second part:

W I T N E S S E T H:

WHEREAS, Pursuant to the D.C. Cable Television Communications Act of 1981, effective August 21, 1982 (D.C. Law 4-142; D.C. Official Code § 34-1201 *et seq.*), as amended, the District, acting through the Council (as defined in Section 1 hereof), has the power to grant and renew franchises for Cable Services (as defined in Section 1 hereof) within the District; and

WHEREAS, Pursuant to the federal Cable Act (as defined in Section 1 hereof), the Congress established certain cable franchising (including renewal) procedures and standards in order to, among other purposes, encourage the growth and development of cable systems, assure that cable systems are responsive to the needs and interests of the local community, assure that cable communications provide and are encouraged to provide the widest possible diversity of information services and other services to the public and assure that access to Cable Service is not denied to any Person (as defined in Section 1 hereof); and

WHEREAS, On December 28, 1984, through the District of Columbia Cable Television Franchise Award Act of 1984, effective March 14, 1985 (D.C. Law 5-163; D.C. Official Code § 34-1213.01, note), the District granted the predecessor in interest of the Company (as defined in Section 1 hereof), a franchise for the provision of cable television services (the "Previous Franchise"), the terms of which are set forth in An Agreement Granting a Franchise to District Cablevision, Inc. to Operate a Cable Television System in the District of Columbia and Setting Forth Conditions Accompanying the Granting of the Franchise, approved by Act on December 28, 1984, as amended by the Cable Television Franchise Agreement Modification Act of 1985, effective November 19, 1985 (D.C. Law 6-59; 32 DCR 7018) and by the Cable Television Communications Act of 1981 Amendment Act of 1987, effective March 16, 1988 (D.C. Law 7-93; 35 DCR 721), (the "Previous Franchise Agreement"); and

WHEREAS, The Previous Franchise, which was scheduled to expire on March 14, 2000, has been extended to March 14, 2002, pursuant to the Approval of the Extension of the Term of District Cablevision Limited Partnership Franchise in the District of Columbia Emergency Act of 2000, effective April 17, 2000 (D.C. Act 13-314; 47 DCR 2847); the Approval of the Extension of the Term of District Cablevision Limited Partnership Franchise Temporary Act of 2000, effective July 18, 2000 (D.C. Law 13-142; 47 DCR 6092); Approval of the Extension of the Term of District Cablevision Limited Partnership's Franchise Act of 2000, effective September 16, 2000 (D.C. Law 13-153; 47 DCR 8059); Mayor's Order 2000-144, adopted September 22, 2000 (47 DCR 8256); Mayor's Order 2000-156, adopted October 12, 2000 (47 DCR 8682); Mayor's Order 2000-169, adopted November 2, 2000 (47 DCR 9536); Mayor's

Attachment 3

THIS AGREEMENT, executed in duplicate this ____ day of _____, 2004, by and between THE DISTRICT OF COLUMBIA (hereinafter referred to as the "District"), by the Mayor of the District and the Chairman of the Council of the District, party of the first part, and STARPOWER COMMUNICATIONS, LLC (hereinafter referred to as the "Company"), party of the second part:

## W I T N E S S E T H:

WHEREAS, Pursuant to the D.C. Cable Act (as defined in SECTION 1 hereof), as amended, the District, acting through the Council (as defined in SECTION 1 hereof), has the power to grant and renew franchises for Cable Services (as defined in SECTION 1 hereof) within the District delivered via an Open Video System; and

WHEREAS, Pursuant to the federal Cable Act (as defined in SECTION 1 hereof), the Congress established certain cable franchising procedures and standards in order to, among other purposes, encourage the growth and development of cable systems, assure that cable systems are responsive to the needs and interests of the local community, assure that cable communications provide and are encouraged to provide the widest possible diversity of information services and other services to the public and assure that access to Cable Service is not denied to any Person (as defined in SECTION 1 hereof) and the Congress, in the Telecommunications Act of 1996, made certain requirements of the Cable Act also applicable to Open Video Systems; and

WHEREAS, The District has been in the forefront among cities nationally in fostering cable competition, for the benefit of District consumers; and

WHEREAS, The District successfully negotiated with the Company in 1998 to bring one of the first Open Video Systems in the country to the District, as a result of which, the majority of District households now have access to a choice of local cable and telephony providers and enjoy the benefits of competition, which include lower cable rates and better service; and

WHEREAS, The federal Cable Act strictly limits the scope of the District's regulatory authority with respect to an Open Video System to management of the public rights-of-way, collection of a percent of gross revenues fee, and oversight of the Company's obligation to provide public, educational, and governmental ("PEG") support, notwithstanding which the Company has agreed to commit itself, through this Agreement, to provide substantial additional public benefits to the District, including in-kind contributions and commitments regarding non-discrimination, local employment and purchasing, reporting, and technical System specifications; and

WHEREAS, The District and the Company entered into an Interim Open Video Systems Agreement ("Interim OVS Agreement") approved by the Mayor on October 26, 1998, and approved by the Control Board on December 10, 1998. The Interim OVS Agreement commenced December 10, 1998, for a term of one year, with a one-time automatic six-month extension, which commenced on December 10, 1999 and was scheduled to expire on June 10, 2000;

Attachment 4

## CHANNEL LEASE AGREEMENT

This Agreement (the "Agreement") is entered into as of _____, 200__ (the "Effective Date") by and between  COMCAST DC    ("Lessor") and _____ ("Lessee").

## RECITALS

A.    Lessor owns and operates a cable television system (the "System") in Washington D.C. (the "Community") pursuant to a franchise or permit (the "Franchise"); and

B.    Lessee desires to lease channel time on the System pursuant to Section 612 of the Communications Act of 1934 as amended (the "Act") and subject to the terms and conditions of this Agreement.

In consideration of the mutual promises and covenants contained in this Agreement, Lessee and Lessor agree as follows:

## AGREEMENT

1.    Definitions.  As used in this Agreement, the following terms have the following meanings:

(a)    "Channel" means bandwidth sufficient to carry one video signal on the System as may be assigned to Lessee from time to time in accordance with the terms of this Agreement.

(b)    "Service" means Lessee's service as specifically described in Exhibit A.

(c)    "Subscriber" means an individual, firm, corporation or other legal entity that subscribes to and receives signals transmitted by Lessor over the System.

2.    Use of Channel.  Lessee agrees to be solely responsible for its programming and the Service and agrees to use the Channel in accordance with the following:

(a)    Subject to Lessee's compliance with all of the terms and conditions of this Agreement, Lessor hereby agrees to distribute the Service on the Channel, whether in its current form or as compressed, modified, digitized, or altered, during the times set forth on Exhibit B.

(b)    Subject to Lessee's compliance with all of the terms and conditions of this Agreement, Lessor agrees that the Service initially shall be distributed on the channel set forth on Exhibit B.  Notwithstanding the foregoing or any other provision of this Agreement, and without any diminution of the obligations of Lessee hereunder, on 30 days' notice Lessor reserves the right to change or reassign (i) the Channel used by Lessee or (ii) the times during which Lessee has the right to use the Channel. Nothing contained herein or elsewhere shall be construed to grant to

Lessee an exclusive or proprietary right to any particular channel, any particular time, or any rights or priorities for further access to the System.

(c)    Lessee shall not use the Channel except to provide the Service to Subscribers in accordance with the terms hereof.

(d)    Lessee shall use the Channel in such a manner as to avoid all liability or claim of liability for tortious, negligent, criminal or other acts or omissions including, without limitation, defamation, indecency, obscenity, personal injury, property damage, invasion of privacy, false light, wrongful publicity, violation of civil rights, infringement of copyright (including without limitation music performance rights, synchronization rights, and mechanical rights for any and all performances through to subscribers), false and misleading advertising and unfair competition.

(e)    No program, production, or presentation may be transmitted by Lessee unless all appropriate copyright clearances, licenses, or other necessary authorizations have been obtained by Lessee (including, without limitation, music performance rights for any and all performances through to Subscribers).

(f)    Lessee's use of the Channel shall not cause any violation by Lessor of any Franchise or other authorization under which the System is operated.

(g)    Lessor's distribution of Lessee's programming will not cause Lessor to violate any law, rule, regulation, or court or administrative decree.

(h)    Ownership, control and use of any and all cable television channels of the System, including the Channel, and the signal distribution capacity contained within the bandwidth of such channels, shall at all times be and remain with Lessor; provided, that any use by Lessor of such channels or capacity shall not materially interfere with the presentation of the principal audio and video portions of Lessee's programming on the Channel.  Except as specifically set forth in this Agreement, this Agreement shall in no manner restrict or limit any rights of Lessor, including, without limitation, Lessor's right to (i) use any of the channels of its broadband distribution systems for the transmission of any material or for any other use, (ii) enter into agreements for the use of its channels and its broadband distribution systems by others; (iii) make use of the Channel (including without limitation leasing to other lessees) during any time when the Channel is not being programmed by Lessee and (iv) use any unused portion of the bandwidth of the Channel, including, without limitation, the vertical blanking interval and any subcarriers associated with the Channel.  Lessee shall have no right to or interest in any subscription fees, equipment fees or other fees or charges received by Lessor from any party, including without limitation the System's subscribers.  All rights not specifically granted to Lessee under this Agreement are reserved to Lessor for its sole and exclusive use, and are exercisable by Lessor at any time in any location by any means whatsoever.

Revision July 2003

3.     Term of Agreement.   Unless sooner terminated pursuant to any provision of this Agreement, the term of this Agreement shall begin on the Effective Date and shall end on the _____ day of _____, 20__.  Lessee shall have no right to continued use of the Channel beyond the term of this Agreement.  All representations, warranties, indemnifications and limitations of liabilities contained in this Agreement will survive termination of this Agreement, as well as any other obligations of the parties hereunder which, by their terms, would be expected to survive such termination or which relate to the period prior to termination.

4.     Content of Service.

(a)     The Service shall consist only of the programming specifically described in Exhibit A and no other use of the Channel is permitted.  Lessee agrees to execute and deliver to Lessor, prior to the distribution by Lessor of the Service, a Certification of Leased Access Programmer in the form of Exhibit E.

(b)     Pursuant to Section 612(h) of the Act, the Service may be subject to the review and approval of Lessor and Lessor's franchising authority.

(c)     Lessee assumes complete responsibility for the content of the Service and Lessor undertakes no responsibility or duty for prescreening or monitoring the Service.  Notwithstanding the foregoing, Lessor reserves the right to refuse to distribute, without notice to Lessee or liability of Lessor, any portion of the Service which Lessor believes, in its reasonable discretion, does not comply with this Agreement.  Any such action from time to time by Lessor shall not relieve Lessee of its obligations hereunder.

(d)     The System shall have the right to cablecast a message at the beginning and end of Lessee's programming in a form substantially similar to the following: "Comcast is required by federal law to make this programming available to its customers.  Comcast is not affiliated with the programmer, and Comcast is not responsible in any way for the content of the programming you are viewing."

(e)     Lessor acknowledges that it has received and read, and that it understands, Lessor's Indecency Policy, a copy of which is set forth in Exhibit D.  Lessor represents that, prior to the transmission of any programming on the System, it will submit to Lessor a fully and accurately completed Certification by Leased Access Programmer (in the form of Exhibit E) with respect to such programming.  Unless Lessee has first obtained Lessor's prior specific consent, and has reached agreement with Lessor as to the terms and conditions pursuant to which such programming shall be distributed by Lessor, no programming provided by Lessee shall contain indecency or inappropriate nudity.  Not in limitation of, but in addition to the foregoing, Lessor reserves the right, unless it has reached agreement with Lessee as set forth above, to refuse to distribute, without notice to Lessee or liability of Lessor, any portion of the Service which Lessor believes, in its reasonable discretion, contains indecency or inappropriate nudity.  In addition, Lessor reserves the right to refuse to distribute, without notice to Lessee or liability of Lessor, any portion of the Service which Lessor believes, in its reasonable discretion, contains obscenity.  Any

Revision July 2003

such action from time to time by Lessor shall not relieve Lessee of its obligations hereunder.

      (f)    No programming provided by Lessee will be obscene.

5.    <u>Billing and Rates</u>.

      (a)    As rent for the use of the Channel, Lessee shall pay Lessor the applicable rate set forth in Exhibit C, which amount shall be paid no less than 30 days in advance of the time period with respect to which the payment relates. Lessee acknowledges that such rates were determined by Lessor in reliance on the Certification of Leased Access Programmer in the form of Exhibit E submitted by Lessee, and Lessee warrants that it has submitted such form to Lessor and that it is accurate. Lessor may change the lease rate at any time or from time to time upon thirty days' prior notice to Lessee. Notwithstanding the foregoing, if the rate set forth in Exhibit C is less than the maximum rate allowable under the law, Lessor may immediately change the lease rate if Lessee changes the content of its programming. Notwithstanding the foregoing or any other provision of this Agreement, if Lessee resells or subleases all or any part of the Channel, the lease rate immediately and automatically, without notice, shall become the maximum rate allowable under the law.

      (b)    If Lessee fails to make any payment when due, in addition to any other rights Lessor may have under this Agreement or at law or in equity, Lessor may refuse to cablecast the programming during the time period with respect to which the missed payment relates. If Lessor chooses to cablecast the programming, any amounts not paid by Lessee when due shall accrue interest at the rate of 1.5% per month or at the highest lawful rate, whichever shall be lesser, compounded monthly, from the date such amounts became delinquent until they are paid in full.

      (c)    Nothing herein shall limit in any way Lessor's right to bill, collect and receive any and all service charges or fees payable to Lessor by Subscribers or Lessor's right to immediately disconnect or deal in any other lawful manner with Subscribers who do not pay such charges or fees.

6.    <u>Technical Requirements</u>.

      (a)    Except for technical assistance to be provided by Lessor as set forth in Exhibit C, Lessee shall pay for and provide all equipment (including without limitation tape players, time base correctors, switching sync generation and power distribution equipment and additional rack equipment) and personnel (who shall be adequately trained to the satisfaction of Lessor) necessary to produce and insert a signal carrying its Service at an insertion point in the System designated by Lessor. Lessee shall pay for and provide maintenance and repair for such equipment, which equipment shall be of a type suitable for use in connection with this Agreement. Lessee warrants and represents to Lessor that such equipment will not infringe any copyrights or patents of any person, firm, corporation or other legal entity. Lessee shall bear sole responsibility for such equipment and shall hold Lessor harmless from any loss or damage thereof or resulting therefrom. Lessee acknowledges that Lessor's headends and other facilities contain expensive and

sophisticated equipment, and Lessee agrees to comply with all reasonable security procedures required by Lessor.

(b)    Neither Lessee's use of the Channel nor its use of any equipment in connection therewith shall impair or interfere with the quality of signals transmitted by Lessor on the System or any service offered thereon by Lessor or any of its programmers, other lessees or licensees.

(c)    If Lessee's use of the Channel involves attachment to the System of Lessee-provided equipment of any kind, the following provisions shall apply:

(i)    The use of Lessee-provided equipment shall not require change in, or alteration of, the equipment or other facilities of Lessor.

(ii)    Before connection of any Lessee-provided equipment, Lessee shall demonstrate to the satisfaction of Lessor that the connection of such equipment will not cause Lessor to be unable to meet its technical requirements or its obligations under the rules and regulations of the FCC or any other regulatory body and will not impair or affect the quality of the signals transmitted by Lessor on the System or any service thereon offered by Lessor or any of its programmers, other lessees or licensees.

(iii)    Lessor reserves the right at all times to refuse to allow Lessee to provide the Service or attach any Lessee-provided equipment to the System or to require the removal or replacement of existing equipment if, in the sole judgment of Lessor, the equipment being used or proposed to be used in connection with the Service or its personnel involved are performing or would perform in a manner which adversely affects or would adversely affect the System, the signals transmitted by Lessor thereon, the services offered by Lessor or any of its programmers, other lessees or licensees or Lessor's ability to comply with the rules and regulations of the FCC or any other regulatory body.

(d)    If, in the sole judgment of Lessor, it is necessary in order to prevent impairment of or interference with the System, the signals Lessor transmits or the service it provides or to comply with the Franchise or the rules and regulations of the FCC or any other regulatory body, Lessor may obtain, install or maintain, at Lessee's expense, any equipment necessary to prevent such adverse affects.

(e)    Lessee may not perform any technical functions or perform any other work affecting or attached to the System without first obtaining Lessor's written approval.

(f)    Nothing contained herein shall be construed as Lessor's consent to the attachment of any facilities or equipment to its tower or other property or facilities. Lessee shall not attach any equipment or facilities to Lessor's tower or other property or facilities without having first entered into a written separate agreement governing such attachment and complying with the terms thereof.

(g)    Lessee's programming shall meet reasonable production standards which will not

be any higher than those applied to public, educational and government access channels.

7.    Regulatory Compliance.

(a)    Lessee shall comply with all provisions of Lessor's Franchise applicable to Lessee, all rules, opinions, policies, and decisions of the FCC (including but not limited to applicable requirements of Part 76, subpart G of the rules of the FCC, as the same may be from time to time amended, notwithstanding whether such rules are rescinded, superseded, or rendered void by judicial determination) or any other regulatory or judicial body having jurisdiction and all federal, state, or local laws, regulations or ordinances applicable to this Agreement and leased access programming, whether such provisions, rules, opinions, policies, decisions, laws, regulations or ordinances are in effect at the date of this Agreement or come into effect during the term of this Agreement.

(b)    Lessee shall comply, and the Service complies and shall continue to comply, in all respects, with all applicable federal, state, and local laws, regulations, and rules including those relating to libel, slander, copyright, indecency, nudity, obscenity, incitement, privacy, and false and misleading advertising.

(c)    Upon request, Lessee shall promptly furnish to Lessor all information with respect to the Service which may be useful in the preparation of certifications, statements, records, or other information which may be necessary or useful to Lessor to comply with applicable law or to determine Lessee's compliance with this Agreement or in any reports or other documents that Lessor may be required or requested to file with any federal, state or local governmental agency.

8.    Resale or Sublease of the Channel.  Prior to any resale or sublease of Lessee's right to use the Channel pursuant to this Agreement, and prior to any use by any person or entity other than Lessee of the Channel, Lessee shall do the following:

(a) deliver to Lessor a completed Sublessee Acknowledgment Form, in the form of Exhibit E signed both by Lessee and by the person or entity other than Lessee that intends to exhibit programming on the Channel by virtue of this Agreement ("Sublessee"); and

(b) deliver to Lessor an insurance certificate demonstrating compliance by Sublessee with all of the requirements of Section 15.

Sublessee's programming shall not be transmitted on the Channel until Lessor has reviewed the Sublessee Acknowledgment Form and insurance certificate and has returned to Lessee a copy of the Sublessee Acknowledgment Form executed on behalf of Lessor, which executed Sublessee Acknowledgment Form shall be returned by Lessor to Lessee within a reasonable time after receipt by Lessor of a complete and properly executed Sublessee Acknowledgment Form and a complete insurance certificate that complies in all respects with the requirements of Section 15. Notwithstanding any resale or sublease of all or any part of the Channel, Lessee shall remain responsible for any use of the Channel by virtue of this Agreement.

9.    Termination.

(a)    This Agreement may be terminated immediately upon the occurrence of any of the following:

(i)    By either party in the event of any breach by the other of any provision of this Agreement (including without limitation any warranty or representation);

(ii)    By either party if termination is required by a final order of any court or governmental body or agency of competent jurisdiction;

(iii)    By Lessor if Lessee fails to make any channel lease payment when due, which failure is not cured by Lessee within five business days after notice from Lessor of such failure.

(iv)    By Lessor if the obligations of Lessor to lease channel space pursuant to Section 612 of the Act are repealed or are adjudged unconstitutional or otherwise invalid or unenforceable in a final, unstayed decision of any court of competent jurisdiction;

(v)    By Lessor if Lessor ceases to provide cable television service to the System or becomes precluded from serving the subscribers of the System because of the termination, revocation or expiration of any franchise, license or other law, rule, regulation, authorization, contract or other document necessary for the operation of the System;

(vi)    By Lessor if Lessee's use of the Channel would violate or would cause Lessor to violate any obligation of Lessor imposed by any contract or governmental authority, including without limitation, municipal, state, federal or administrative;

(vii)    By either party if the use of the Channel pursuant to this Agreement is precluded by lawful action of any state, federal or municipal authority, or if, in the reasonable judgment of Lessor, the renewal of its Franchise or license would or could be endangered by the continuation or implementation of this Agreement;

(viii)    By Lessor if Lessee should file, or should have filed against it, a petition in bankruptcy (voluntary or involuntary), or become insolvent, reorganized or make any assignment for the benefit of creditors, or make any arrangement or be subject to any other proceeding under the bankruptcy laws of the United States or the insolvency laws of any state; and

(ix)    By Lessee upon thirty days' prior written notice to Lessor.

(b)    Upon any termination of this Agreement, all sums then due under this Agreement shall become payable immediately, all obligations of Lessor pursuant to this Agreement shall cease and Lessee promptly shall remove all of its equipment from the facilities of the System or of Lessor. If Lessee fails to remove its equipment, Lessor shall have the right to remove and to store, both at Lessee's expense, all such equipment located on Lessor's premises. If Lessee does not claim any such equipment and pay Lessor's costs of removal and storage within 30 days after notice to Lessee, Lessor may sell such equipment at public or private sale, and may retain any costs of

Revision July 2003

removal, storage and sale. Lessee agrees to indemnify and hold Lessor harmless from any and all liabilities, damages, losses, costs and expenses (including without limitation, reasonable attorneys' fees and expenses of defending claims or litigation) arising, directly or indirectly, from or related to Lessor's removal, storage or sale of the equipment pursuant to this Section.

10.    Limitation of Lessor's Liability. This Agreement shall not under any circumstances create any rights in any party other than Lessee and Lessor. If Lessor fails or is unable for any reason to perform any of its obligations pursuant to this Agreement and as a result Subscribers do not receive the Service or receive the Service at a technically unacceptable quality, Lessor's liability therefor shall be limited to a proportional refund of lease payments made hereunder based on the period of time during which Subscribers did not receive the Service or the quality of the Service was technically unacceptable. In no case shall Lessor be liable to Lessee, any Sublessor or any of the Subscribers or others for any other direct or consequential losses, claims, damages, expenses or liabilities or for any act beyond Lessor's reasonable control. In addition, while Lessor shall use reasonable care, it shall assume no risk and make no guarantee, express or implied, regarding the safety of tapes or other materials in Lessor's possession. In the event of loss or damage of such tapes or materials, Lessor's liability shall be limited to the replacement cost of unrecorded tape or unexposed film stock.

11.    Rights, Licenses and Permissions.

    (a)    Lessee warrants and represents to Lessor that the Service and any promotional materials used by Lessee will not infringe any copyrights (including, without limitation, synchronization rights and performing rights), rights of privacy, use and distribution rights, rights to the use of any trademark, trade name, service mark, or patent, or any other property right or other right whatsoever of any person, corporation, firm or other entity.

    (b)    Lessee shall be responsible at its own expense for obtaining all consents, authorizations, licenses and permits necessary for providing the Service to Subscribers and using any equipment or devices to be supplied or used by Lessee in connection with the Service or use of the Channel, including without limitation making all necessary arrangements with copyright holders, sponsors, music licensing organizations (including obtaining any and all music performance rights for all performances through to the subscribers), performers' representatives and all other appropriate persons or entities to transmit its programming on the System, which arrangements shall include, without limitation, compliance with all applicable charitable solicitation registration requirements. Lessee shall make available to Lessor, upon request, copies of any consents, authorizations, licenses and permits required in connection with this Agreement.

12.    Indemnification. Lessee shall hold Lessor, its parent, subsidiaries and affiliates, and their respective officers, directors, partners, agents and employees harmless, and indemnify them, from any and all liabilities, losses, damages, suits, actions, claims, judgments, costs and expenses (including legal fees and costs) whatsoever arising from or related to (a) the Service, (b) use by Lessee of the Channel or the System, (c) breach by Lessee of this Agreement, (d) violation of the protected rights of any third party, including, without limitation, any liabilities, losses, damages,

suits, actions, claims, judgments, costs or expenses based upon libel, slander, invasions of privacy, false or misleading advertising, or violation or infringement of copyrights, trademarks, trade names, service marks, patents or other property rights or any other rights whatsoever (e) any claims which may be made by any governmental body or agency or any person or entity (including, but not limited to, Lessee or Lessee's agents or employees) in connection with Lessee's programming or use of any of the Channel, (f) any injury to any person (including without limitation Lessor's or Lessee's agents, employees, or invitees) or damage to Lessor's equipment or other assets, resulting from Lessee's use of the Channel and (g) the content of Lessee's programming and/or Lessor's use and delivery thereof.

13.    Taxes and Charges. Any and all federal, state and local taxes and other governmental fees or charges of any nature whatsoever payable with respect to distribution of the Service or use of the Channel by Lessee pursuant to this Agreement, other than income taxes imposed on Lessor for the rent paid under this Agreement, shall be the responsibility of Lessee and shall not be deductible from any amounts payable by Lessee to Lessor. Lessee agrees to pay to Lessor, upon presentation of an invoice to Lessee, any excise, use, sales, copyright, royalty, privilege or other fees or taxes now or hereafter imposed or levied by any association, government or governmental agency upon Lessor by virtue of Lessee's use of the Channel.

14.    Use of Lessor's Name.

(a)    Lessee is prohibited from using Lessor's name, service marks, logos, or trade names in Lessee's advertising or in any other manner or for any purpose without the prior written consent of Lessor, which consent may be withheld or delayed in Lessor's sole and absolute discretion. Notwithstanding the foregoing, Lessee may use Lessor's name (but not Lessor's logo) for the limited purpose of identifying where Lessee's programming may be viewed.

(b)    Lessee shall take all necessary measures to ensure that there is no confusion between the Service and the services offered by Lessor and no confusion concerning the absence of any legal relationship other than this Agreement. Lessee shall not take any action or make any statement, orally or in writing, as part of the programming or otherwise, that could create the impression that Lessor or its affiliates endorse the views expressed in the Service or are involved in the creation or production of the Service or are in any manner affiliated with or responsible for Lessee or the Service. Upon request by Lessor, any advertising or promotional material identifying the Service which Lessee proposes to use shall be submitted to Lessor for its prior approval at least 20 days prior to the date such material shall be used. If Lessor fails to notify Lessee of any objection to such material within such 20 day-period, then such material may be used until such time as Lessor objects to the use of such material. Lessor retains the right to insert a message stating that Lessor is not responsible for the Service. Lessee's advertising and promotion materials will set forth a separate telephone number, different from that of Lessor, for parties to call who desire information about the Service.

15.  Insurance.

   (a)   Lessee, at Lessee's sole expense, shall obtain and keep in force throughout the term of this Agreement, with a reputable insurance company approved by Lessor and authorized to do business in the state in which the System is located, insurances with coverages and limits as follows:

   (i)   If required by statute, a policy (or policies) of Workers' Compensation insurance covering Lessee's employees in the state in which the System is located. Each such policy shall be on a form approved for use in such state, and shall provide, at a minimum, statutory Workers' Compensation coverage, and Employer's Liability at limits of not less than $100,000 each accident for Bodily Injury by Accident, $300,000 policy limit for Bodily Injury by Disease, and $100,000 each employee for Bodily Injury by Disease.

   (ii)   Commercial General Liability Insurance on current standard forms as promulgated by the Insurance Services Office ("ISO") that covers at least Premises and Operations, Products and Completed Operations, Blanket Contractual Liability for both Oral and Written Contracts and Broad Form Property Damage. The limits of liability for such insurance shall be no less than $1,000,000 per Occurrence for Bodily Injury and Property Damage, all as defined in the ISO form, and no less than $1,000,000 per Occurrence and $1,000,000 in the aggregate for Products-Completed Operations, and $1,000,000 policy General Aggregate.

   (iii)   Media Perils Liability Insurance (Broadcasters' Liability/Errors and Omissions) to cover Lessee's media activities as described in this Agreement, including but not limited to, production of programming and all programming cablecast under the terms of this Agreement (including but not limited to original programming, marketing activities, sales promotions, and other activities). Such insurance shall cover, at a minimum, the "offenses" of defamation of character or reputation; invasion of privacy; infringement of trademark, title, slogan, trade name or service mark; and infringement of copyright or misappropriation of ideas. The limit of liability for such insurance shall be no less than $1,000,000 in any one policy period. The maximum self-insured retention under such insurance shall be $5,000, unless Lessee obtains the prior written consent of Lessor to increase such self-insured retention, which consent may be withheld by Lessor in its sole discretion.

   (b) Both the Commercial General Liability and Broadcaster's (Media Perils) Liability policies shall be endorsed to provide that (i) with respect to the activities and obligations of Lessee under this Agreement, Lessor shall be included as an Additional Insured, with the added provision that Lessee's policies shall provide primary and non-contributory coverage to Lessor, irrespective of any insurance carried by Lessor, whether it be primary, excess, contingent or on any other basis; (ii) the insurer waives any rights of subrogation it may have against Lessor; and (iii) the policy shall provide coverage on an "Occurrence" basis; a "Claims-Made" policy is not acceptable.

   (c) Prior to or contemporaneously with the execution of this Agreement, Lessee shall deliver to Lessor standard ACORD certificates of insurance, as proof of the maintenance of all

insurance policies required by this Section. The certificates shall indicate that such insurance shall not be canceled or modified except upon delivery of thirty (30) days' prior written notice to Lessor. The certificates shall indicate coverage for the entire term of this Agreement, or Lessee shall provide (and shall continue to provide) subsequent certificates of insurance so as to confirm to Lessor continuous insurance coverages that satisfy the above requirements, throughout the term of this Agreement.

16.    Termination Upon Subscriber Request. Lessor may terminate reception of Lessee's programming by any subscriber of the System who requests such termination. Lessee shall pay all costs associated with such termination.

€)17.    Notices. All notices, demands, requests or other communications given under this Agreement shall be in writing and be given by personal delivery, certified mail, return receipt requested, or nationally recognized overnight courier service to the address set forth below or as may subsequently in writing be requested.

If to Lessee:

                     _____
                     _____
                     _____
                     Attn.: _____
                     Email: _____

If to Lessor:

                     _____
                     _____
                     _____
                     Attn.: _____

With a copy to:

                     Comcast Cable Communications, LLC
                     1500 Market Street
                     Philadelphia, PA 19102
                     Attn.:  General Counsel

or to such other addresses as either party may designate to the other in writing. Delivery of any notice shall be deemed to be effective: (i) on the date of personal delivery, (ii) on the date set forth on the receipt of registered or certified mail or (iii) on the day after mailing by overnight courier.

18.    Subscriber Information. Lessee, without Lessor's prior written consent, (i) shall not obtain, use or disclose information (whether the information is "personally identifiable information" under §631 of the Act or not) to any third party regarding Lessor's or any of its affiliates' cable television

or other subscribers; and (ii) shall not engage in any direct mailing or telephone solicitation, for any purpose, targeted to cable television or other subscribers of Lessor or any of its affiliates.

19. Warranties of Lessee.

     (a)     Lessee has the right and authority to enter into this Agreement and to perform its obligations hereunder. The person executing this Agreement on behalf of Lessee has been authorized to do so by Lessee. The obligations created by this Agreement, insofar as they purport to be binding on Lessee, constitute legal, valid and binding obligations of Lessee enforceable in accordance with their terms. Lessee is under no contractual or other legal obligation which shall in any way interfere with its full, prompt and complete performance hereunder.

     (b)     Lessee will comply, and its programming complies and will comply, with all provisions of Lessor's franchises applicable to Lessee and with all present and future federal, state and local laws, rules, regulations, decisions, or administrative decrees (including without limitation those of the FCC).

     (c)     In accordance with Section 612 of the Act, Lessee is unaffiliated with Lessor or its affiliates.

20.     Warranties of Lessor. Lessor represents and warrants that Lessor has the right and authority to enter into this Agreement and to perform its obligations hereunder. The obligations created by this Agreement, insofar as they purport to be binding on Lessor, constitute legal, valid and binding obligations of Lessor enforceable in accordance with their terms. Lessor is under no contractual or other legal obligation which shall in any way interfere with its full, prompt and complete performance hereunder.

21.     Miscellaneous.

     (a)     Governing Law. This Agreement and the rights and obligations of Lessor and Lessee in connection therewith shall be interpreted in accordance with federal law and the law of the state in which the System is located.

     (b)     Legal Status. It is understood and agreed that: (i) no agency, employment, joint venture or partnership relationship between the parties is created by this Agreement; (ii) the business to be operated by Lessee is separate and apart from any which may be operated by Lessor; (iii) Lessee is not an affiliate of Lessor; and (iv) no representation will be made by either party which would create an apparent agency, independent contractor or partnership relationship. Lessee shall have no power or authority to act for Lessor in any manner to create obligations or debts which would be binding upon Lessor. Lessor shall not be responsible for any act or omission of Lessee, or of Lessee's employees, agents, servants or invitees.

(c)    Integration.  This writing and the exhibits attached hereto, all of which exhibits are incorporated herein by reference, represent the entire agreement and understanding of the parties with respect to the subject matter hereof; it may not be altered or amended except by an agreement in writing signed by both parties.

(d)    Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, successors, representatives and assigns.  Notwithstanding the foregoing, except as provided in Section 8, Lessee shall not relinquish, sublease, assign, sell or otherwise transfer its rights and obligations under this Agreement to any other person or entity. Lessor may sell, assign or transfer this Agreement to any person or entity without the consent of Lessee.

(e)    Severability.  If any part of any provision of this Agreement is invalid or unenforceable under applicable law, the provision shall be ineffective only to the extent of such invalidity or unenforceability without in any way affecting the remaining parts of the provision or this Agreement.

(f)    Confidentiality.  All information regarding Lessor's operations shall be deemed confidential and proprietary.  When gained from any source, all such information shall be held by Lessee in the strictest confidence and not revealed to any third party.

(g)    No Reliance.  Lessee acknowledges that (i) nothing contained in this Agreement or otherwise shall obligate the parties to enter into any further business relationship or agreement, and (ii) Lessee is not relying on Lessor in operating and/or developing Lessee's business.

(h)    Force Majeure.  In addition to Lessor's other rights of termination hereunder, Lessor's performance hereunder shall be excused by the occurrence of any of the following events or conditions, for the entire periods during which such events or conditions continue: prevention, delay or stoppage due to strikes, lockouts, picketing, boycotts, inability to obtain labor or materials or reasonable substitutes therefor, enemy or hostile governmental action, civil commotion, fire, acts of God, flood, earthquake, tornado, hurricane, weather, mechanical or equipment failure, transportation lacks, energy shortages, governmental restrictions, regulations, or controls, or other causes or occurrences beyond Lessor's reasonable ability to control.  The occurrence of any event described above shall not cause the term of this Agreement to be extended or obligate Lessor to refund any amount to Lessee.

(i)    Paragraph Headings.  Paragraph headings are for ease and reference only and are not to be utilized to expand, limit or otherwise modify the terms of this Agreement.

(j)    Waiver.  The failure of either party to enforce at any time, or for any period of time, any of the provisions hereof with respect to any breach or obligation of the other party shall not be construed as a waiver of such provisions or any other provisions, nor shall such failure otherwise restrict the right of such party to enforce each and every lawful provision of this Agreement.

Revision July 2003

(k)    <u>Condition Precedent</u>.  Lessor's obligations hereunder are conditioned upon the timely performance by Lessee of Lessee's obligations hereunder.  The rights hereunder shall not extend to any areas now served or later served by broadband distribution systems owned or operated by Lessor or its affiliates, whether connected physically, operationally or otherwise with the System.

**IN WITNESS WHEREOF,** and intending to be legally bound, the parties have executed this Channel Lease Agreement as of the date first above written.

**LESSOR**:

_____

By: _____

Its: _____

**LESSEE**:

_____

By: _____

Its: _____

## EXHIBIT A

## Description of the Service

Rev. 2-20-03

## EXHIBIT B

### Lease Schedule

Initial Channel

Distribution Schedule

Note:   Reasonable efforts will be made to cablecast Lessee's Programming at the requested time or in a reasonably comparable time period.  Notwithstanding the foregoing, channel placement and times of cablecast are subject to change at the discretion of the Lessor.

Rev. 2-20-03

B-1

## EXHIBIT C

### Rates and Payment

Rate For Use of Channel

Technical Support
Lessee will pay the following charges for the technical support set forth below:

Technical Support Fees

Technical Support to be Provided by Lessor

Note:  Except for any technical support to be provided by Lessor that is specifically listed above, Lessor shall be required to provide no technical support to Lessee.

Rev. 2-20-03

C-1

**EXHIBIT D**
**Comcast Leased Access Indecency Policy**

As authorized by federal law, it is Comcast's general policy to refuse carriage of indecent programming on commercial leased access channels. In certain limited cases, only upon Comcast's prior written consent on a case by case basis, which consent may be withheld by Comcast in its sole discretion, Comcast may make limited exceptions to this policy and allow the carriage on commercial leased access channels of indecent programming that is scrambled, cablecast only during late night hours or otherwise determined by Comcast to be cablecast in a manner that protects its customers from undesired viewing of the indecent programming. In most cases Comcast will require a certification as to all indecent programming that meets the requirements contained in Exhibit D to Comcast's form of Channel Lease Agreement.

Nothing in this Indecency Policy shall constitute an agreement by Comcast to cablecast any indecent programming, no matter how cablecast, and no matter what certifications are made, on any commercial leased access channel. Consequently, unless Comcast already has agreed in writing to cablecast indecent programming in the specific circumstance, *no leased access user may transmit, or submit for transmission, any indecent programming on any full-time or part-time leased access channel on any Comcast cable system.*

Comcast does not intend to routinely pre-screen leased access programming for indecency. Rather, Comcast will rely on the leased access channel user's warranty, made in the Channel Lease Agreement, that the leased access channel user will not transmit, or submit for transmission, any unapproved indecent program material. However, Comcast reserves the right to pre-screen leased access programming from time to time, at its sole discretion. If, in pre-screening leased access programming or through notification from subscribers, officials, community residents or otherwise, Comcast discovers that leased access programming contains unapproved indecent material, Comcast will prohibit or reschedule transmission of that leased access programming or take other appropriate action. Any leased access user who transmits unapproved indecent programming, or submits such programming for transmission over a Comcast cable system, in violation of this policy and/or in breach of the warranties made in the Channel Lease Agreement will subject the Channel Lease Agreement to immediate termination. Comcast also reserves the right to pursue all remedies available to it under the Channel Lease Agreement, at law and in equity.

Indecent material is defined by the Communications Act of 1934, as amended, as "programming that the cable operator reasonably believes describes or depicts sexual or excretory activities or organs in a patently offensive manner as measured by contemporary community standards." 47 U.S.C. § 532(h). In evaluating whether material is indecent, Comcast will apply a good faith judgment under this standard, and may look to such explanations published by the FCC or other authority that may come to its attention.

**EXHIBIT E**

Rev. 2-20-03

## Certification of Leased Access Programmer

In connection with the Channel Lease Agreement (the "Agreement") dated _____, 20__ entered into by _____ ("Lessor") and _____ ("Lessee"), Lessee certifies the following:

1. **Indecency and Obscenity**. Lessee acknowledges that it has received from Lessor and understands Lessor's Leased Access Indecency Policy (the "Indecency Policy") and that all programming submitted by Lessee pursuant to the Agreement (the "Programming") complies in all aspects with the Indecency Policy. Lessee certifies that the Programming is in the following category:

☐ **Programming is not obscene**

☐ **Programming is not indecent**

☐ **Programming is indecent** but Lessee has accurately and fully completed all sections of this certification, Lessee has discussed the indecent content of the Programming with Lessor, and Lessor and Lessee have agreed in writing on the specific terms and conditions pursuant to which the Programming will be cablecast on the System.

If Lessor does not certify that the Programming is not obscene, the Service will not be cablecast on the System and the Agreement immediately shall terminate. If Lessee does not certify that the Programming is not indecent, Lessor will assume that the Programming is indecent and will only cablecast the Programming if Lessor and Lessee agree in writing as to the specific terms and conditions pursuant to which the Programming will be cablecast.

2. **Indecent Programming Certifications**. If the Programming is indecent, Lessee certifies the following:

A.    The Programming does not contain any live programming or any programming depicting rape, torture, abuse towards women, sexual violence, necrophilia,  male on male scenes, scenes depicting drug usage, anal penetration, male ejaculation, sadism, sado masochism, bestiality, bondage, incest or programming involving or suggesting sexual activity with, between or among minors. No direct on-air marketing or sale of products or services will advertise, promote, sell or contain any (i) illegal products or services; (ii) products or items which invade the body or (iii) sexual appliances or items used for simulated sexual intercourse.

B.    With respect to the Programming, (A) Lessee is in compliance in all respects with the Child Protection Restoration and Penalties Enhancement Act of 1990, including without limitation all record keeping requirements associated with such law and (B) even if Lessee is not a primary producer, Lessee is in possession of, and has reviewed, all records that must be maintained

Rev. 2-20-03

E-2

by a primary producer and such records cover all individuals viewable in the Programming, even if such individuals clearly are adults.  Lessee shall make available to Lessor, upon request, copies of all or any such records.

3. **Type of Programming**.  Lessee certifies that all of its programming submitted for cablecasting pursuant to the Agreement is in the following category.

    ☐ **A La Carte Programming**  (Programming for which Subscribers must pay a per event or per channel charge)

    ☐ **Basic or Tier Programming**

All capitalized terms not defined in this Certification shall have the meanings given to them in the Agreement.

Lessee hereby acknowledges that Lessor is expressly relying upon the foregoing representations and certifications, and acknowledges that it has read the foregoing, understands it and agrees that it is true and correct.

Rev. 2-20-03

E-3